BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
STEPHANIE AVILES (350289)
saviles@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599

*Counsel for Plaintiff Karen Gioli*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN GIOLI, derivatively on behalf of THE WALT DISNEY COMPANY, | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| ROBERT A. CHAPEK, CHRISTINE M. MCCARTHY, ROBERT A. IGER, SUSAN E. ARNOLD, SAFRA A. CATZ, AMY L. CHANG, FRANCIS A. DESOUZA, MICHAEL B.G. FROMAN, MARIA ELENA LAGOMASINO, CALVIN R. MCDONALD, MARK G. PARKER, CAROLYN N. EVERSON, KAREEM DANIEL, MARY T. BARRA, and DERICA W. RICE, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| THE WALT DISNEY COMPANY, | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Karen Gioli ("Plaintiff"), by and through her undersigned attorneys, brings this Verified Shareholder Derivative Complaint, for the benefit of Nominal Defendant The Walt Disney Company ("Disney" or the "Company") against defendants Robert A. Chapek ("Chapek"), Christine M. McCarthy ("McCarthy"), Robert A. Iger ("Iger"), Susan E. Arnold ("Arnold"), Safra A. Catz ("Catz"), Amy L. Chang ("Chang"), Francis A. deSouza ("deSouza"), Michael B.G. Froman ("Froman"), Maria Elena Lagomasino ("Lagomasino"), Calvin R. McDonald ("McDonald"), Mark G. Parker ("Parker"), Carolyn N. Everson ("Everson"), Kareem Daniel ("Daniel"), Mary T. Barra ("Barra"), and Derica W. Rice ("Rice") (collectively, the "Individual Defendants") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff's allegations are based upon personal knowledge as to herself and her own acts, and upon information and belief, based on the investigation of Plaintiff's counsel, including a review of filings by Disney with the U.S. Securities and Exchange Commission ("SEC"), publicly available filings in lawsuits, including in the related securities fraud class action pending in this District, captioned *Local 272 Labor-Management Pension Fund v. The Walt Disney Company, et al.,* No. 2:23-cv-03661-CBM-AS (the "Securities Class Action"), press releases, news reports, analyst reports, industry reports, investor conference transcripts, and other information available in the public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from December 10, 2020 to the present (the "Relevant Period").

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2.      Since its founding in 1923, Disney has grown into a global giant in the entertainment industry. Disney, along with its various subsidiaries, is engaged in the production and distribution of film and episodic content through a multitude of television networks. Disney boasts various legacy distribution platforms and the Company recently turned to offering Direct-to-Consumer ("DTC") services through the platforms Disney+, ESPN+, and Hulu.

3.      On December 10, 2020, during its' Investor Day event, Disney revealed its plans for its' DTC offerings through Disney+. Investors were captivated by Disney+ and considered it a serious threat to Netflix's DTC market dominance. Disney+ had a growing number of subscribers and was developing a wealth of content to consumers. However, these investors did not know that Disney+'s subscriber growth was slowing down, Disney+ had serious subscriber retention problems, and that the Company was aggressively seeking new subscribers without regard to the quality of those subscriptions. This combination of problems resulted in a rapid loss of momentum that adversely affected the financial condition of the entire Company.

4.      Disney's aggressive growth strategy failed to account for profitability. Worse yet, The Wall Street Journal reported that Disney was covertly shifting costs and hiding expenses that should have been attributed to Disney+ to create a false image that Disney+ was on track to be profitable. Under these circumstances, it is evident that Disney's positive statements about the company's business, operations, and prospects were materially false and/or misleading and/or lacked a reasonable basis.

5.      These revelations forced Disney to defend itself in the Securities Class Action titled *Local 272 Labor-Management Pension Fund v. The Walt Disney Company et al.*, Case No. 2:23-cv-03661, in the United States District Court for the Central District of California (the "Securities Class Action"). The Securities Class

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Action alleged that Disney and several of its officers defrauded investors as to the Company's true financial condition and business products.

6.     Worse yet, throughout the Relevant Period, Disney's Board of Directors (the "Board"), which was comprised of Defendants Barra, Catz, Chang, deSouza, Everson, Froman, Iger, Lagomasino, McDonald, Parker, and Rice (the "Director Defendants"), caused Disney to repurchase $78.7 million of its own stock at artificially high prices, which caused the company to make an overpayment of more than $30 million. This occurred while the Director Defendants privately knew that Disney's streaming services were struggling and the Company's stock was artificially inflated.

7.     Despite their knowledge of the facts and information that had an adverse impact on the Company's business, operations, and outlook, and that the Company's SEC filings did not reflect the adverse facts discussed above, and knowing that Disney stock was trading at an artificially inflated price — several of the Individual Defendants, using their knowledge of facts that are not publicly known, sold significant amounts of their personally held shares of Disney stock.

8.     The Individual Defendants now face liability to the company for, among other things: (i) affirmatively making, allowing to be made, and/or failing to correct improper statements in SEC filings relating to the Company's business, operations, and prospects; (ii) failing to maintain adequate controls regarding the Company's financial reporting; (iii) trading in the stock of the Company based on their knowledge of the events described herein; and (iv) such other and further actions described herein.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 14(a), 20(a), and 21D of the Exchange Act (15 U.S.C. §§ 78j, 78n(a), and 78u-4(f)), as

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

well as SEC Rule 10b-5 and Exchange Act Rule 14a-9 (17 C.F.R. §§ 240.10b-5 and 240.14a-9).

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

11. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is headquartered in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have received substantial compensation in this District, and Defendants' actions have had an effect in this District.

## PARTIES

13. Plaintiff is a shareholder of Disney. She was a shareholder at the time of the wrongdoing and has continuously held stock in the Company at all times relevant to the wrongdoing by Defendants alleged herein.

14. Nominal Defendant Disney is incorporated under the laws of Delaware, and its principal executive offices are located at 500 South Buena Vista Street, Burbank, California, 91521. Disney's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "DIS."

15. **Defendant Chapek** served as the Company's Chief Executive Officer ("CEO"), as a member of the Board, and as a member of the Executive Committee, from February 2020 until his termination on November 20, 2022. Defendant Chapek received $9,940,392 in total compensation for fiscal year 2023.

16. **Defendant McCarthy** served as the Company's Chief Financial Officer ("CFO") from 2015 until her resignation in June 2023. Prior to her resignation, Defendant McCarthy held various positions working for the Company for 23 years. Defendant McCarthy received $20,235,669 in total compensation for fiscal year 2022.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17.     **Defendant Iger** has served as the Company's CEO since November 2022. Previously, Defendant Iger served as the Company's CEO from 2005 to 2020. Defendant Iger also served as Chairman of the Board from March 2012 through December 2021 and as Executive Chairman from 2020 to December 31, 2021. Defendant Iger received $41,114,015 in total compensation for fiscal year 2024.

18.     **Defendant Arnold** served as a member of the Board from 2007 to 2023. Defendant Arnold served as Chairman of the Board from December 31, 2021 to April 3, 2023. Prior to her departure, Defendant Arnold served as Chair of both the Executive Committee and the Governance and Nominating Committee. Defendant Arnold received $298,797 in total compensation for fiscal year 2023.

19.     **Defendant Catz** served as a member of the Board from 2018 through 2024. Defendant Catz was a member of the Audit Committee, sitting as its Chair from 2020 to April 3, 2023. Defendant Catz received $293,102 in total compensation for fiscal year 2024.

20.     **Defendant Chang** has served as a member of the Board since 2021 and serves as a member of the Nominating & Corporate Governance Committee. Defendant Chang received $398,677 in total compensation for fiscal year 2024.

21.     **Defendant deSouza** served as a member of the Board from 2018 through 2024, serving on the Audit Committee during that time. Defendant deSouza received $216,056 in total compensation for fiscal year 2024.

22.     **Defendant Froman** has served as a member of the Board since 2018. Froman currently serves as the Chair of the Corporate Governance and Nominating Committee and previously served as a member of the Audit Committee. Defendant Froman received $418,417 in total compensation for fiscal year 2024.

23.     **Defendant Lagomasino** has served as a member of the Board since 2015. Defendant Lagomasino has served as a member of the Governance Committee since at least 2020. Defendant Lagomasino has also served as a member

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the Compensation Committee since 2016, sitting as its Chair since 2020. Defendant Lagomasino received $406,883 in total compensation for fiscal year 2024.

24.    **Defendant McDonald** has served as a member of the Board since 2021. Defendant McDonald serves as a member of the Audit Committee and served as a member of the Compensation Committee from 2022 to 2024. Defendant McDonald received $368,866 in total compensation for fiscal year 2024.

25.    **Defendant Parker** served as a member of the Board from 2016 to 2025. Defendant Parker served as a member of the Governance Committee from 2018 to 2021 and as a member of the Compensation Committee since 2020. Defendant Parker received $580,955 in total compensation for fiscal year 2024.

26.    **Defendant Everson** has served as a member of the Board since 2022. Defendant Everson serves as a member of the Compensation Committee. Defendant Everson received $384,732 in total compensation for fiscal year 2024.

27.    **Defendant Daniel** worked at Disney from 2007 to 2022. In October 2020, Defendant Daniel was selected by Defendant Chapek to serve as the first and only Chairman of the Disney Media and Entertainment Distribution segment (defined herein). Defendant Daniel was dismissed from Disney in November 2022.

28.    **Defendant Barra** has served as a member of the Board since 2017. She is a current member of the Compensation Committee. Defendant Barra received $387,715 in total compensation for fiscal year 2024.

29.    **Defendant Rice** has served as a member of the Board since 2019. Defendant Rice has served as a member of the Audit Committee since 2022, sitting as Chair since 2023. He also served as a member of the Governance Committee from 2020 to 2021. Defendant Rice received $418,173 in total compensation for fiscal year 2024.

30.    **Non-Party Director James P. Gorman ("Gorman")** has served as a

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

member of the Board since 2024. Gorman serves as the chairman of Executive Committee. Gorman received $234,760 in total compensation for fiscal year 2024.

31.    **Non-Party Director David Jeremy Darroch ("Darroch")** has served as a member of the Board since 2024. Darroch serves as a member of the Audit Committee. Darroch received $270,476 in total compensation for fiscal year 2024.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32.    At all relevant times, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its shareholders, the members of the public who had invested in Disney.

33.    Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

34.    The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

35.    Each of the Company's directors owes to the Company and its shareholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

36.    Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

37.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and

directors of Disney were required to do the following:

   (a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

   (b) Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   (c) Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

   (d) Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

   (e) Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

   (f) The Individual Defendants knowingly violated their obligations as directors and/or officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its shareholders despite their knowledge of the risk of serious injury to the Company.

   (g) Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

complained of herein, as well as the contents of the various public statements issued by Disney.

## DISNEY'S STANDARDS OF BUSINESS CONDUCT

38.    Disney has adopted a Code of Business Conduct and Ethics for Directors (the "Code"), which states that the Board "promotes ethical behavior" and that every director must "represent the interests of the shareholders of The Walt Disney Company." The Code is "mandatory and applies to all Directors, who are accountable for compliance with the Code."

39.    In a section titled "Conflicts of Interest" the Code states:

Directors must avoid conflicts of interest. A conflict of interest occurs when an individual's private interest interferes in any way with the interests of the company or any of its subsidiary and affiliated companies (collectively, the "Company"). A conflict of interest may also arise when a Director, or a member of his or her immediate family[] receives improper personal benefits as a result of his or her position in the Company. Directors should also be mindful of, and seek to avoid, conduct which could reasonably be construed as creating an appearance of a conflict of interest.

40.    In the section titled "Use of Corporate Information, Opportunities and Assets" the Code states:

Directors may not compete with the Company, or use opportunities that are discovered through the use of Company property, Company information or Company position, for their personal benefit or the benefit of persons or entities outside the Company.  No Director may improperly use or waste any Company asset.

41.     In the section titled "Confidentiality" the Code states that "no Director shall use Confidential Information for his or her own personal benefit." "Confidential Information" is defined in part as "all non-public information entrusted to or obtained by a Director by reason of his or her position as a Director of the Company."

## DISNEY'S CORPORATE GOVERNANCE GUIDELINES

42.     The Board has also adopted Corporate Governance Guidelines (the "Guidelines") which state that: "Each Director shall at all times represent the interests of the shareholders of the Company."

43.     In the section titled "Functions of the Board of Directors" the Guidelines state that it is the "responsibility of the Board [] to supervise and direct management of the Company in the interest of and for the benefit of the Company's shareholders."

44.     In the section titled "Board Conduct and Review" the Guidelines state:

> Members of the Board shall act at all times in accordance with the requirements of the Company's Code of Business Conduct and Ethics for Directors. This obligation shall at all times include, without limitation, strict adherence to the Company's policies with respect to conflicts of interest, confidentiality, protection of the Company's assets, ethical conduct in all business dealings and respect for and compliance with applicable law.

## DISNEY'S AUDIT COMMITTEE CHARTER

45.     The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Catz, deSouza, and Rice during the Relevant Period. The Audit Charter states:

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The responsibilities of the Board of Directors (the "Board") of The Walt Disney Company (the "Company") include oversight of the Company's systems of internal control, preparation and presentation of financial reports and compliance with applicable laws, regulations and Company policies. Through this Charter, the Board delegates certain responsibilities to the Audit Committee (the "Committee") to assist the Board in the fulfillment of its duties to the Company and its shareholders.

46.    The Audit Charter specifically states that the "Committee shall be given the resources and assistance necessary to discharge its responsibilities, including appropriate funding" and "unrestricted access to Company personnel and documents and the Company's independent auditors."

47.    Pursuant to the Audit Charter, the overarching duties of oversight that the Audit Committee is tasked with include oversight of "the integrity of the Company's financial statements," "the adequacy of the Company's system of internal controls," the "Company's compliance with legal and regulatory requirements," and "to prepare the audit committee report as required by the Securities and Exchange Commission [] to be included in the Company's annual proxy statement."

48.    The Audit Charter tasks the Audit Committee with the following responsibilities:

(a)    Financial Reporting. The Audit Committee shall monitor the preparation by management of the Company's quarterly and annual external financial reports. In carrying out this responsibility, the Audit Committee shall:

///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Review with management the significant financial reporting issues, judgments and estimates used in developing the financial reports, including analyses of the effects of alternative GAAP methods on the financial statements.

- Review the accounting and reporting treatment of significant transactions outside the Company's ordinary operations.

- Review with management and the Company's independent auditors significant changes to the Company's accounting principles or their application as reflected in the financial reports.

- Review with management and the Company's independent auditors the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

- Meet periodically with the Company's independent auditors (in private, as appropriate) (a) to review their reasoning in accepting or questioning significant decisions made by management in preparing the financial reports; (b) to review any audit problems or difficulties and management's response; (c) to review any outstanding disagreements with management that would cause them to issue a non-standard report on the Company's financial statements; (d) to examine the appropriateness of the Company's accounting principles (including the quality, not just

12

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the acceptability, of accounting principles) and the clarity of disclosure practices used or proposed; (e) to determine if any restrict ions have been placed by management on the scope of their audit; and (f) to discuss any other matters the Committee deems appropriate.

- Review earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others, and discuss their appropriateness with management and the Company's independent auditors, paying particular attention to any use of "proforma" or "adjusted" non-GAAP information.

- Review draft quarterly and annual financial statements and discuss their appropriateness with management and the Company's independent auditors, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board ("PCAOB") and the SEC.

- Consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K; and

///
///

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Prepare the audit committee report required by Item 407(d)(3)(i) of Regulation S-K for inclusion in the proxy statement of the Company related to its annual meeting of security holders.

\*\*\*

(c)    Internal Control. The Audit Committee shall have responsibility for overseeing that management has implemented an effective system of internal control that helps promote the reliability of financial and operating information and compliance with applicable laws, regulations and Company policies, including those related to risk management, ethics and conflicts of interest. In carrying out this responsibility, the Audit Committee shall:

- Inquire of management, management auditors and the Company's independent auditors concerning any deficiencies in the Company's policies and procedures that could adversely affect the adequacy of internal controls and the financial reporting process and review any special audit steps adopted in light of any material control deficiencies and the timeliness and reasonableness of proposed corrective actions.
- Review significant management audit findings and recommendations, and management's responses thereto.
- Meet periodically with management auditors in private session (without the participation of management or the independent auditors).
- Review the Company's policies and practices with respect to risk assessment and risk management.

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Review the Company's policies and practices related to compliance with laws, ethical conduct and conflicts of interest.
- Review significant cases of conflicts of interest, misconduct or fraud.
- Review significant issues between the Company and regulatory agencies.

**THE GOVERNANCE AND NOMINATING COMMITTEE CHARTER**

49. The Nominating and Governance Committee Charter (the "Governance Charter") imposes additional duties and responsibilities on the members of the Governance Committee, which included Arnold, Chang, Froman, Lagomasino, and Parker during the Relevant Period. Among the duties imposed by the Governance Charter, is the duty to "[m]onitor the implementation and operation of the Company's Corporate Governance Guidelines." This includes reviewing "from time to time, as the Committee deems appropriate, the adequacy of the Corporate Governance Guidelines in light of broadly accepted practices of corporate governance, emerging governance issues and market and regulatory expectations, and to advise and make recommendations to the Board with respect to appropriate modifications."

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

50. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct alleged herein giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51. During all times relevant hereto, the Individual Defendants,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

collectively and individually, initiated a course of conduct that was designed to and did, among other things, deceive the investing public including stockholders of Disney. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

52.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused and/or allowed the improper conduct described herein.

53.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of state and federal law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and to conceal adverse information concerning the Company's business, operations, and future prospects.

54.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly engage in the improper conduct described herein. Because the Individual Defendants' actions occurred under the authority of the Board, each Individual Defendant was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.    Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

I.    **Background**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

56.     In February 2020, Disney announced that Defendant Iger would step down as CEO, and be replaced by Defendant Chapek, who had worked under Iger for over ten years. Defendant Iger then assumed the role of Executive Chairman until December 31, 2021, in which he continued to direct Disney's creative endeavors and lead the Board.

57.     Soon after, Disney faced a significant challenge. In March 2020, just one month after Defendant Chapek assumed the role of CEO, many countries entered lockdowns in attempts to contain the COVID-19 pandemic.

58.     These lockdowns negatively affected Disney's businesses as it was forced to shutter its theme parks, resorts, and cruise lines. The lockdowns also forced Disney to completely pause movie distribution and productions, and its live programming television networks were halted — primarily, because sporting events were cancelled in response to the pandemic. As a result of these difficulties, in May 2020, Disney announced that it was suspending its dividends. In August 2020, Disney reported its first quarterly loss in 19 years. In November 2020, Disney reported its first annual loss in over 40 years.

59.     Although most of Disney's businesses suffered considerable challenges because of the COVID-19 pandemic — the Company's new streaming service, Disney+, saw a significant increase in subscriptions.

60.     Disney+ was launched in the United States in November 2019. Disney initially provided an estimate that by the end of fiscal year 2024, Disney+ would have between 60 million to 90 million paid subscribers. However, the COVID-19 lockdowns led to a significant increase in the number of people staying at home — which led to a dramatic increase in paid subscriptions for Disney+ and other streaming services.

61.     In October 2020, Chapek consolidated Disney's operations into only two reporting segments: (1) Disney Media and Entertainment Distribution

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

("DMED") and (2) Disney Parks, Experiences, and Products ("DPEP"). Prior to Chapek's reforms, Disney was organized into four reporting segments: (1) Media Networks; (2) Parks, Experiences, and Products; (3) Studio Entertainment; and (4) Direct-to-Consumer & International. Disney's change in structure marked a significant departure from Disney's historical reporting structure and created considerable internal controversy, since the change took power away from creative content-focused executives and instead was granted into a new reporting group piloting DMED.

62.    The DMED segment included Disney+ and operated under the direction of Defendant Chapek and Defendant Daniel, and with knowledge of Defendant McCarthy. DMED became responsible for monetizing all Disney content globally. In addition, the DMED segment also was responsible for distribution and advertising sales, as well as overseeing the operations of Disney's streaming services. Notably, both Chapek and Daniel were authorized to decide which platform Disney's content would be released on. This strategic reorganization was intended to accelerate Disney's new DTC strategy.

63.    On October 12, 2020, during an interview on CNBC, Defendant Chapek explained that Disney's reorganization is meant to "accelerate our transition to a real direct-to-consumer priority company." He continued: "We believe that we've got the opportunity to build upon the success of Disney+, which by almost any measure has been far and above anybody's expectations and really use this to catalyze our growth and increase shareholder wealth."

64.    Also on October 12, 2020, Disney issued a press release announcing the restructuring and explained that Disney's centralization would capitalize on the success of Disney+ and stated, in relevant part:

Under the new structure, Disney's world-class creative engines will focus on developing and producing original content for the Company's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

streaming services, as well as for legacy platforms, while distribution and commercialization activities will be centralized into a single, global Media and Entertainment Distribution organization. The new Media and Entertainment Distribution group will be responsible for all monetization of content—both distribution and ad sales—and will oversee operations of the Company's streaming services. It will also have sole P&L accountability for Disney's media and entertainment businesses.

65.    The press release also contained the following statement from Defendant Chapek, who stated in relevant part:

"Given the incredible success of Disney+ and our plans to accelerate our direct-to-consumer business, we are strategically positioning our Company to more effectively support our growth strategy and increase shareholder value," Mr. Chapek said. "Managing content creation distinct from distribution will allow us to be more effective and nimble in making the content consumers want most, delivered in the way they prefer to consume it. Our creative teams will concentrate on what they do best—making world-class, franchise-based content—while our newly centralized global distribution team will focus on delivering and monetizing that content in the most optimal way across all platforms, including Disney+, Hulu, ESPN+ and the coming Star international streaming service."

## II.    False and Misleading Statements Issued by the Individual Defendants During the Relevant Period

66.    On December 10, 2020, Disney held its 2020 Investor Day event to provide shareholders with an update on the Company's business operations, structural reorganization, DTC initiatives, and published a related slide presentation

on Disney's official website. Defendants Chapek, McCarthy, and Daniel delivered scripted portions of the presentation, and Defendants Chapek and McCarthy also participated in an analyst Q&A session.

67.    During this presentation, Defendant Chapek stated that the Company had already surpassed its preliminary subscriber projections for Disney+, stating, in relevant part:

> Disney+ has exceeded our wildest expectations with 86.8 million subscribers as of December 2. That's quite an achievement!
>
> This success has bolstered our confidence in our continued acceleration towards a DTC-first business model. And more importantly, it's launched The Walt Disney Company into a new era of delivering consumers truly exceptional entertainment build around our world-renowned brands and franchises.

68.    Defendant Chapek also explained how the new DMED unit would distribute Disney's content onto the platform most beneficial to consumers, stating, in relevant part:

> Our unique access to an incredible number of consumer touch points across our businesses gives us a clear advantage. Based on insights gained from this wealth of data, our distribution and commercialization team is able to better inform our creatives of consumer preferences. And the creative teams are empowered to make the high-quality branded entertainment they believe will resonate with audiences.
>
> This new organization also gives us maximum flexibility in determining when and on which platform content will be available.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

And this is especially important now given consumers' rapidly changing consumption behaviors and the prolonged uncertainty due to the pandemic.

As circumstances change, we will continue to consider these and other critical factors when determining what steps we may take to most effectively distribute our programming. Our goal is always to serve consumers in the best way possible.

69.     During the same presentation, Defendant Daniel touted how the consumer data gathered by Disney would help the Company maximize audience engagement and commercial impact, stating, in relevant part:

As a company, we were set up to achieve success in an increasingly dynamic environment. And as Bob mentioned, consumer behavior really does drive our decision-making. While we have always valued the data gained through our numerous consumer touch points, the rapid growth of our portfolio of DTC services provides us with an even greater opportunity to understand their preferences. And we are using these insights to help determine how to optimally engage with our audiences. In fact, our team uses all of the information available to us when determining how best to allocate our creative content budgets across all platforms, with the goal to maximize both audience engagement and commercial impact. And we share this budgetary framework and critical insights with our creative partners as part of a truly collaborative planning process that delivers high-quality branded entertainment to achieve our established growth objectives for all of our platforms, from direct-to-consumer to linear networks to theatrical exhibition.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

This exchange of information is a key pillar to our organization's overall strategy, which also relies on the increased flexibility provided by our mix of distribution options, including, in no particular order, releasing content through traditional windows, such as theaters and linear networks before it is made available on our direct-to-consumer services, particularly recognizing the actual exhibition's ability to help establish major franchises that are at the heart of our Disney flywheel; providing our accretive output simultaneously, day and date on both traditional and DTC platforms, in concert with our premier access commercialization strategy for the DTC component; and exclusively distributing our content on our streaming services, providing a constant flow of new titles for subscriber acquisition and to minimize churn.

Of course, regardless of where it originates, all of our films and episodic series will inevitably end up as part of our incredibly rich and increasingly robust library of content on our DTC platforms.

Since streaming has quickly become a preferred method of consumption, we are prioritizing our DTC platforms, both in terms of how we distribute our content and also through an increased investment in our original programming for Disney+, Hulu, ESPN+ and the upcoming Star-branded international general entertainment offering.

* * *

One of the primary benefits of our new organizational structure is our ability to quickly reevaluate and adjust our plans in light of changes in the marketplace, and we will continue to shift and optimize our mix of

window theatrical, day-and-date and DTC exclusive offerings according to what is best for the consumer and our business.

70. During the presentation, Defendant McCarthy provided profitability and subscriber guidance for Disney+ (and related foreign streaming services such as Disney+ Hotstar, a subscription video on demand streaming service owned by Disney that operates in India), reiterating that by the end of Disney's fiscal year 2024, Disney+ would have 230 to 260 million subscribers. In relevant part, Defendant McCarthy stated:

> Today, I'm going to provide guidance across our services for fiscal 2024 to be consistent with the time frame we guided to at our last Investor Day. Let me start with Disney+ which, as you heard earlier today, had 86.8 million total paid subscribers as of December 2, approximately 30% of which were Disney+ Hotstar subscribers.
>
> * * *
>
> If you recall, last year, we said that we expected Disney+ to have between 60 million and 90 million subscribers by the end of fiscal 2024. But as you know, our subscriber growth to date is well ahead of our original expectations. And we have an incredible and growing slate of high-quality content that will capture a broader global audience and further fuel Disney+, making it what we believe is an even more compelling product.
>
> These factors, along with the addition of our Star general entertainment offering in various markets and the growth of Disney+ Hotstar, give us an even greater optimism about our future. And they enable us to significantly increase our subscriber guidance.

We now expect that by the end of fiscal 2024, we will have ***between 230 million and 260 million total paid Disney+ subscribers globally compared to the 60 million to 90 million we shared last year.*** I'll note that our prior outlook did not anticipate the launch of Disney+ Hotstar, which we now expect could be between 30% and 40% of our subscriber base by the end of fiscal 2024.

* * *

Given the value of growing our subscriber base, as you've seen today, we plan to reinvest revenue generated from our better-than-expected subscriber growth back into content investment. Thus we continue to expect Disney+ to achieve profitability in fiscal 2024. Again, I'll note that this guidance includes Disney+, Star, Star+ and Disney+ Hotstar.

71.    The presentation slides published with the 2020 Investor Day presentation echoed the Company's projections that, by the end of fiscal year 2024, Disney+ would be profitable and would boast a subscriber base ranging from 230 million to 260 million paid global users. The materials further represented that, of this subscriber base, 30-40% would be attributed to Disney+ Hotstar. Notably, these figures signified a nearly threefold increase in comparison to previous forecasts, without any reduction in the anticipated profitability for this business segment.

72.    In response to an analyst question during the Q&A portion of the presentation, Defendant Chapek explained how the decision was made to determine when and on which platform(s) Disney's content would be distributed, stating in relevant part:

To me, it's really about over – of the 100 titles that we announced today, 80% of them are going first to Disney+, which I think says something about our pivot over to Disney+. But at the same time, we

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

had $13 billion of box office last year. And that's obviously not something to sneeze at. And we know as The Walt Disney Company who've got this plethora of franchises that we just showed you today, that we build those franchises through the theatrical exhibition window and we did $13 billion back in '19. So for us, it's about balance. And it's about following the consumer as they make that transition.

And so part of why we did the reorganization that we did is to ensure that we've got an organization that's flexible to read all the cues, whether it's the cessation of COVID or it's changing consumer behavior so that we can very nimbly make decisions as we go forward. And that 80% direct-to-consumer is not just Disney+, obviously, but that includes Hulu and Star as well.

73.    On February 11, 2021, Disney published a press release announcing its first quarter 2021 financial results. On an earnings call held the same day, Defendant McCarthy confirmed that there was no need to revise the 2024 Disney+ subscriber guidance as the Company was expected to reach profitability, stating in relevant part:

We said at our Investor Day, which wasn't too long ago, that we expected to reach profitability in fiscal 2024. We're not going to change that at this point, although we are very pleased with the results that we just announced. But we are also, given the value of growing our sub base, we are continuing to invest in high- quality content. ***We believe that content is the single biggest driver to not only acquiring subs, but retaining them.***

74.    On May 13, 2021, Disney issued a press release announcing its second quarter 2021 financial results. Therein, the Company announced that it had 103.6

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

million subscribers as of April 3, 2021, which represented a 200% increase over its, previous subscriber count of 33.5 million on March 28, 2020.

75.     During a related earnings call held that same day, Defendant Chapek reiterated the Company's position regarding reaching 230 million to 260 million subscribers by 2024:

> We are uniquely positioned with the most compelling brands and franchises in entertainment, and we continue to deliver the high-quality, one-of-a-kind content that consumers want. That's clearly reflected in the success of Disney+ which amassed nearly 104 million paid subscribers as of the end of the second fiscal quarter. We are on track to achieve our guidance of 230 million to 260 million subscribers by the end of fiscal 2024.

76.     During the same call, Defendant McCarthy also stated, "[a]s [Defendant Chapek] mentioned earlier, we remain right on track to reach our fiscal 2024 guidance of 230 million to 260 million subs[cribers], powered by the addition of 30 million paid Disney+ subs[cribers] in the first half of the year."

77.     The Individual Defendants made these representations despite knowing that initial subscriber numbers for Disney+ had been boosted temporarily and unsustainably by a low launch price, as well as a series of short term, low-cost promotions, to a near-captive audience of consumers who were homebound due to COVID-19 restrictions.

78.     In truth, during the Relevant Period, Disney+ was never on track to achieve the 2024 profitability and subscriber figures provided to investors and such estimates lacked a reasonable basis in fact. To conceal these adverse facts, the Individual Defendants engaged in a fraudulent scheme designed to: (1) hide the extent of Disney+ losses; (2) make the growth trajectory of Disney+ subscribers

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

appear sustainable; and (3) make the 2024 Disney+ targets appear achievable when they were not.

79.    Specifically, the Individual Defendants used the newly created DMED division to inappropriately shift costs out of the Disney+ platform and onto legacy platforms, like the Disney Channel. As part of a scheme to make Disney+'s financial performance appear more successful than it was, the Individual Defendants caused the Company to air certain shows that were supposed to be Disney+ originals on the Disney Channel. By doing so, a significant portion of the marketing and production costs of the shows were shifted away from Disney+ and on to the legacy platforms. Despite this cost-shifting scheme, the Individual Defendants repeatedly represented during the Relevant Period that platform distribution decisions were made based on different reasons, such as customer preferences and what was best for the business commercially.

80.    Following a series of disclosures — including that Disney's DTC segment suffered an operating loss of $1.47 billion for the fiscal year 2022 and a decrease in its average revenue per Disney+ subscriber — investors learned that Disney failed to disclose that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) Disney executives were concealing the true costs incurred in connection with the Disney+ segment by debuting content intended for Disney+ on its legacy distribution channels, and later making them available on Disney+'s content library—thereby improperly shifting production costs away from Disney+ and into the legacy distributors; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference and behavior; (4) the 2024 Disney+ global subscriber and profitability targets were not achievable, Disney was not on track to achieve those targets, and the Individual Defendants lacked a reasonable basis to set such targets; and (5)

Disney failed to maintain internal controls. In short, the Individual Defendants materially misrepresented the actual performance of Disney+, the sustainability of Disney+'s growth trend, the profitability of Disney+, and the likelihood that Disney could achieve its 2024 Disney+ subscriber and profitability targets.

### III.    The Truth Begins to Emerge and the Individual Defendants Double Down on Their False and Misleading Statements

81.    On August 12, 2021, during Disney's Third Quarter 2021 earnings call, Defendant Chapek stated that the Disney+ price increases were having no effect on subscriber churn, stating: "We're really pleased with churn. We've taken some price increases over the past few quarters. And what you're seeing is that churn has declined. . . So the fact that churn is low, our engagement is so high, our retention is so high."

82.    On September 21, 2021, the Company and Defendant Chapek gave a virtual presentation at the Goldman Sachs Communacopia Conference. During this presentation, Defendant Chapek acknowledged that Disney+ subscriber growth slowed in the fourth quarter of the fiscal year ending on October 2, 2021, stating: "In Q4, I think what you can expect to see is that our global paid subs will increase by low single digit millions of subscribers versus Q3. But importantly, our core market sub growth will continue both domestically and internationally in Q4, but we hit some headwinds." Defendant Chapek went on to reaffirm the Company's 2024 goals for Disney+ subscriptions, stating, "[w]e're very confident about our long-term sub growth as we always have been."

83.    This new information concerning the number of global paid Disney+ subscribers failed to meet the market's expectations. On September 21, 2021, CNBC reported the disappointing news from the conference, stating in relevant part:

>    Disney expects to add "low single-digit millions" of streaming
>    subscribers in the fourth quarter, Chapek said. Disney shares ended the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

session down 4.1% after Chapek's comments at the virtual Goldman Sachs Communacopia Conference.

Chapek said "mobilizing partners" in Latin America to push Disney's new Star+ streaming service, the Covid-related suspension of the India Premier League – whose games air on Disney's Hotstar – and production delays from the delta variant have all hurt subscriber numbers in the fourth quarter.

"We are going to see a little bit more noise than maybe the Street projects quarter to quarter," Chapek said. "The resurgence of Covid and delta did impact some of our productions."

Chapek's forecast is significantly lower than some analyst estimates. Deutsche Bank analyst Bryan Kraft had projected Disney+ net adds of about 13 million in the quarter.

Global production delays will be "very short term," Chapek said. But he acknowledged there won't be as much new programming in the fourth quarter "than we might have expected," which will affect subscriber growth.

Disney has projected 230 million to 260 million Disney+ subscribers by 2024. Disney said in August it had 116 million Disney+ subscribers. Chapek cautioned investors that quarter-to-quarter growth "is not linear" and some choppiness is expected. Still, he remained confident in Disney's long-term growth outlook.

84.    On this news, Disney's common stock fell $7.44 per share, or more than 4%, closing at $171.17 per share on September 21, 2021.

85.    On November 10, 2021, Disney issued a press release announcing its fourth quarter and full year 2021 financial results, which missed expectations of 119.6 million subscribers, $18.78 billion in revenues, and adjusted earnings per

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

share of 49 cents. Instead, the Company only added 2.1 million customers during the quarter, revenue of $18.53 billion, and adjusted earnings per share of 37 cents.

86.    Despite these revelations, the price of Disney common stock remained artificially inflated because of the failure of the Individual Defendants to disclose the whole truth. In addition, the Individual Defendants continued to make materially false and misleading statements which continued to artificially inflate the price of Disney common stock. For instance, during the related earnings call held after the market closed that same day, Defendant Chapek downplayed the issue related to subscriber numbers and once again stood by Disney's 2024 guidance, stating:

> I want to reiterate that we remain focused on managing our DTC business for the long term, not quarter-to-quarter, and we're confident we are on the right trajectory to achieve the guidance that we provided at last year's Investor Day, reaching between 230 million and 260 million paid Disney+ subscribers globally by the end of fiscal year 2024, and with Disney+ achieving profitability that same year.

87.    Defendant McCarthy also reiterated Disney+'s profitability and 2024 subscriber guidance:

> As [Defendant Chapek] mentioned, we are increasing our overall long-term content expense for Disney+, and we are all well positioned to achieve the 30 million to 260 million by fiscal 2024 that we laid out at last year's Investor's Day. And we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024.

88.    On this news, the company's stock fell $12.34 per share, or more than 7%, on November 11, 2021, on abnormally high trading volume.

89.    On February 9, 2022, Disney issued a press release announcing its fourth quarter and full year 2021 financial results. During the related earnings call,

Defendant Chapek reported that "11.8 million Disney+ subscribers" were added in the first quarter of 2022 and stated:

> As I've said before, we continue to manage our services for the long-term, and maintain confidence in our guidance of 230-260 million total paid Disney+ subscribers globally by the end of Fiscal 2024.

90.     Defendant McCarthy likewise stated, "[we] ended the quarter with nearly 130 million global paid Disney+ subscribers, reflecting over 11 million net additions from Q4."

91.     On May 11, 2022, Disney released its Fiscal Q2 2022 Form 10-Q with the SEC. During the related earnings call, Defendant Chapek told investors that Disney ended the quarter with an additional "7.9 million Disney+ subscribers, keeping us on track to reach 230 million to 260 million Disney+ subscribers by fiscal '24."

92.     During the call, Defendant McCarthy stated: "[w]e ended the quarter with nearly 138 million global paid Disney+ subscribers, reflecting close to 8 million net additions from Q1." Disney's Fiscal Q2 2022 10-Q also reported that there were 137.7 million paid Disney+ subscribers as of Fiscal Q2 2022.

93.     On August 9, 2022, Disney released its Fiscal Q3 2022 Form 10-Q with the SEC, along with a press release announcing its third quarter 2022 financial results. On August 10, 2022, during the related earnings call, Defendant McCarthy lowered the Company's 2024 guidance for Disney+.

> Finally, before we move to Q&A, I want to spend some time sharing a few updates on our fiscal 2024 guidance for Disney+. We are providing more detail on subscriber targets by separating our guidance into 2 categories: core Disney+ and Disney+ Hotstar. Excluding the impact of any significant future macro headwinds, our core Disney+

subscriber target range is 135 million to 165 million by the end of fiscal 2024, largely consistent with previously provided guidance that non-Hotstar Disney+ subscribers in 2024 would approximate 60% to 70% of the expected 230 million to 260 million total subscriber base.

We are, however, updating subscriber guidance for Disney+ Hotstar to up to 80 million subscribers by the end of fiscal 2024. We intend to refine this target over time as subscriber visibility in India will be clearer once the ICC and BCCI cricket rights sales processes are completed. As you may know, we recently made the disciplined decision to not proceed with the Indian Premier League digital rights, and we'll evaluate these rights with that same discipline.

94.     Despite lowering the guidance, Defendant McCarthy maintained the Company's position that Disney+ would achieve profitability by 2024, stating:

As we sit here today, we remain confident that Disney+ will achieve profitability in fiscal 2024 and look forward to several upcoming catalysts, including reaching a steady state of tentpole original content releases, delivery of premium general entertainment and international local originals and the upcoming launch of our ad-supported tier, alongside the new pricing structure announced earlier today.

95.     On November 8, 2022, Disney issued a press release announcing its fourth quarter and full year 2022 financial results. Therein, Defendant Chapek was quoted as stating:

Our fourth quarter saw strong subscription growth with the addition of 14.6 million total subscriptions, including 12.1 million Disney+ subscribers. The rapid growth of Disney+ in just three years since launch is a direct result of our strategic decision to invest heavily in

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

creating incredible content and rolling out the service internationally, and we expect our DTC operating losses to narrow going forward and that Disney+ will still achieve profitability in fiscal 2024, assuming we do not see a meaningful shift in the economic climate. By realigning our costs and realizing the benefits of price increases and our Disney+ ad supported tier coming December 8, we believe we will be on the path to achieve a profitable streaming business that will drive continued growth and generate shareholder value long into the future. And as we embark on Disney's second century in 2023, I am filled with optimism that this iconic company's best days still lie ahead.

96.     The Company's revenue for the fourth quarter of 2022 grew only 9% to $20.15 billion, which was below analyst estimates of $21.36 billion; sales were only $20.1 billion, which was short of analysts' projections by one billion; and earnings of $.30 per share were below the average analyst estimate of about $0.51. Likewise, Disney's DTC segment reported an operating loss of about $1.5 billion compared to a $630 million loss in the same quarter in 2021. Revenue in the DTC segment only increased by 8% to $4.9 billion.

97.     Disney also reported a decline in its average revenue per Disney+ subscribers, since more customers subscribed through a discounted bundle with the Company's other services. Indeed, about 40% of domestic subscribers were subscribed through the discounted bundle offering — confirming that Disney relied on short-term promotional efforts to boost subscriber growth at the cost of the platform's long-term profitability.

98.     On this news, Disney's stock fell $13.15 per share, or more than 13%, on an unusually high volume of shares traded.

99.      Less than two weeks later, and only five months after the Board had voted to extend Defendant Chapek's employment contract, on November 20, 2022,

the Board announced that it had terminated Defendant Chapek and replaced him with Defendant Iger as CEO.

100.   Defendant Daniel was terminated less than 24 hours later.

101.   On November 21, 2022, *The Wall Street Journal* issued a report titled *Walt Disney CFO, Others Brought Concerns to Board Over Bob Chapek* (the "Wall Street Report"). The Wall Street Report disclosed several issues that ultimately led to Defendant Chapek's dismissal, whose position at the Company had reportedly "been shaky for months."

102.   Significantly, the Wall Street Report also disclosed a cost-shifting scheme employed by the Individual Defendants that was designed to hide certain expenses that should have been attributed to Disney+, so that the streaming service would appear closer to profitability than it actually was. According to the Wall Street Report, the Individual Defendants were not merely aware of this strategy but intentionally employed it to deceive investors — with Defendant McCarthy reportedly expressing concern about its propriety. The report stated, in relevant part:

> The trouble came to a head Nov. 8, when Mr. Chapek hosted a conference call with analysts after Disney's weaker-than-expected quarterly report. Disney had just reported a loss of $1.47 billion in its streaming business, more than twice the loss reported in the prior-year quarter and had underperformed analysts' expectations in revenue and income. Profit margins at the theme parks—Disney's best-performing division over the past year—were shrinking, the company said, and the streaming segment's goal of profitability by September 2024 could be in danger if the economy worsened. Despite the gloomy report, Mr. Chapek's tone on the call was upbeat and his outlook positive. "We believe we are on a path to profitable streaming business that generates shareholder value long into the future," he said.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

* * *

Ms. McCarthy, the CFO, told board members that she wasn't happy with the way Mr. Chapek had communicated with investors during the conference call, people familiar with the matter said. * * * Mr. Iger had long expressed displeasure with the organizational structure Mr. Chapek put in place to handle content distribution, according to people familiar with the matter. Shortly after taking the reins of the entertainment giant, Mr. Chapek had restructured the company's television and film operations and created a distribution arm to determine the best platform for any given content, whether that is a streaming service, a TV network or movie theaters. As part of that change, content executives no longer had control over their budgets. Mr. Chapek said at the time that the moves were a recognition of changing consumer habits and were meant to give priority to its streaming-video services. Mr. Iger has told people close to him that he didn't think the new regime made sense, said the people, adding that it took away freedom from the creative side of the business.

* * *

But the streaming division, which Mr. Chapek has said he expected to be profitable by the company's 2024 fiscal year, has lost more than $8.5 billion since Disney+ was launched and has posted bigger operating losses in each of the past four quarters. Under Mr. Chapek, Disney has increased its content spending dramatically—to around $30 billion this year alone.

Like many of its rivals, Disney is now trying to shift from a growth oriented streaming strategy to profitability, but is doing so in a difficult economic environment and an intensely competitive market. Disney is

moving some shows that were supposed to be Disney+ originals and air them first on other networks including the Disney Channel, people familiar with the matter said. By doing so, the costs of production and marketing of the shows—which included mystery show "The Mysterious Benedict Society" and medical drama "Doogie Kameāloha, M.D."—would be shifted away from the streaming service, making its financial performance look better, they said. Ms. McCarthy was concerned about this strategy, the people said.

103.    Other news outlets similarly reported that Defendant Chapek was "cooking the books, engaging in a series of deceptive accounting practices, in an effort to hide actual losses the company was seeing related to its signature streaming service" and that "he disguised Disney+'s losses by moving budgets for its original shows."

### IV.    The Truth Emerges

104.    On February 8, 2023, Disney issued a press release announcing its first quarter financial results for 2023. The Company reported that Disney+ lost 2.4 million subscribers and that the DTC business segment reported an increase in operating loss from $0.5 billion to $1.1 billion, which reflected higher programming and production costs.

105.    On a conference call that same day, Defendant Iger announced that a broad restructuring plan would be employed with the goal of putting the Company's streaming business on a path to profitability and growth, stating, in relevant part:

In 2019, Disney+ launched, with nearly 500 films and 7,500 episodes of television from across the world of Disney. Three years later, its meteoric rise is considered one of the most successful results in the history of the media business.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Now it's time for another transformation, one that rationalizes our enviable streaming business and puts it on a path to sustained growth and profitability while also reducing expenses to improve margins and returns and better positioning us to weather future disruption, increased competition and global economic challenges. We must also return creativity to the center of the company, increase accountability, improve results and ensure the quality of our content and experiences.

106.    Defendant Iger emphasized that to restore Disney's success, creative power had to be returned to the Company's creative executives, and those executives should have the power to make their own distribution decisions. This is a reversal from Defendant Chapek's decision to take away power from the creative executives as part of his October 2020 restructuring plan. Defendant Iger stated:

Our company is fueled by storytelling and creativity. And virtually every dollar we earn, every transaction, every interaction with our consumers emanates from something creative. I've always believed that the best way to spur great creativity is to make sure that people who are managing the creative process feel empowered. Therefore, our new structure is aimed at returning greater authority to our creative leaders and making them accountable for how their content performs financially. Our former structure severed that link, and it must be restored. Moving forward, our creative teams will determine what content we're making, how it is distributed and monetized and how it gets marketed.

107.    Defendant Iger also announced that the Company would be reorganized into three core business segments to allow creative executives to maximize revenue and growth, stating, in relevant part:

Managing costs, maximizing revenue and driving growth from the content being produced will be their responsibility.

Under our strategic reorganization, there will be three core business segments…Disney Entertainment, ESPN and Disney Parks, Experiences and Products.

\* \* \*

These organizational changes will be implemented immediately, and we will begin reporting under the new business structure by the end of the fiscal year.

This reorganization will result in a more cost-effective, coordinated and streamlined approach to our operations. And we are committed to running our businesses more efficiently, especially in a challenging economic environment.

108.    Defendant Iger further indicated that Disney would be cutting $5.5 billion in costs with $2.5 billion in non-content cuts (including 7,000 jobs) and $3 billion in content savings over the next few years, stating, in relevant part:

[W]e are targeting $5.5 billion of cost savings across the company. First, reductions to our non-content costs will total roughly $2.5 billion, not adjusted for inflation. $1 billion in savings is already underway, and Christine will provide more details. But in general, the savings will come from reductions in SG&A and other operating costs across the company.

To help achieve this, we will be reducing our workforce by approximately 7,000 jobs. While this is necessary to address the challenges we're facing today, I do not make this decision lightly. I have enormous respect and appreciation for the talent and dedication

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of our employees worldwide, and I'm mindful of the personal impact of these changes.

On the content side, we expect to deliver approximately $3 billion in savings over the next few years, excluding sports. Christine will be providing more details during the call.

Turning to our streaming businesses. I'm proud of what we've been able to achieve since the launch of Disney+ just 3 years ago. We are delivering more content with greater quality in more ways, in more places and to larger audiences.

109.   Further, Defendant Iger stated that Disney would no longer provide long-term subscriber guidance for Disney+, stating:

Like many of our peers, we will no longer be providing long-term subscriber guidance in order to move beyond an emphasis on short-term quarterly metrics — although we will provide color on relevant drivers. Instead, our priority is the enduring growth and profitability of our streaming business.

110.   On May 10, 2023, Disney issued a press release announcing disappointing second quarter 2023 financial results. The Company reported that Disney+ had lost subscribers for the second quarter in a row, which further confirms that the 2024 Disney+ targets had always been out of reach. Indeed, during the quarter, Disney+ lost 4 million paid subscribers, which contrasted with analyst expectations that Disney+ would add 1.7 million subscribers. Furthermore, although streaming revenue increased by 12%, this change was mostly attributable to price hikes necessitated by Disney+'s large losses.

111.   During a conference call that same day, Defendant Iger admitted that in order to have a chance at realizing profitability, "it's critical we rationalize the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

volume of content we're creating and what we're spending to produce our content."
He further announced that Disney was planning another price increase, at least for
the Disney+ ad-free tier, risking even further subscriber losses.

112. On this news, the price of Disney stock fell $8.83 per share, or more
than 8% on May 11, 2023, on an unusually high trading volume.

## V.    During the Relevant Period, Disney's Proxy Statements Contained False and Misleading Statements

### 1. The 2021 Proxy Statement

113. On January 19, 2021, Disney filed its annual proxy statement with the
SEC pursuant to Section 14(a) of the Exchange Act (the "2021 Proxy Statement").
Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino,
Parker, and Rice solicited the 2021 Proxy Statement, which contained material
misstatements and omissions.

114. The 2021 Proxy Statement solicited Disney stockholders to vote to,
among other things: (1) re-elect defendants Chapek, Arnold, Barra, Catz, deSouza,
Froman, Iger, Lagomasino, Parker, and Rice to the Board; and (2) approve, on an
advisory basis, the Company's executive compensation.

115. The 2021 Proxy Statement notes that "[a]s CEO, and during one of the
most challenging environments the Company has faced, Mr. Chapek adeptly
managed the enormous disruption to the Company's business, while at the same
time restructuring Disney's media and entertainment businesses to fuel the long-
term creative and financial growth of the Company." The Compensation Committee
recognized the following highlights when justifying Defendant Chapek's
compensation:

- In the wake of COVID-19's impact on theaters and our content
  pipeline, worked to quickly program new offerings on our DTC and
  linear channels, while preparing plans to responsibly reopen our
  parks and production operations around the world.

- Launched our direct-to-consumer services in several key markets, while converting Hotstar to Disney+ Hotstar and announcing the launch of a Star international general entertainment service planned for fiscal 2021 in Latin America and Europe.
- Enhanced and focused the Company's D&I efforts through a new, six-pillar approach that puts a premium on Transparency, Representation, Accountability, Community, Inclusive Content and Culture. Began delivering change by establishing the CEO Diversity & Inclusion Council, championing the Black Talent Network, investing in inclusive storytelling and requiring leader accountability.
- Recognition of Disney as one of the "World's Most Admired Companies" by Fortune (#4 overall and #1 in entertainment) and #2 in MBLM's annual Brand Intimacy Study, which measures the bonds consumers form with the brands they use and love.

116.    Likewise, in the section titled the "Board's Role in Risk Oversight," the 2021 Proxy statement stated:

As noted in the Company's *Corporate Governance Guidelines*, the Board, acting directly or through committees, is responsible for "assessing major risk factors relating to the Company and its performance" and "reviewing measures to address and mitigate such risks." In discharging this responsibility, the Board, either directly or through committees, assesses both (a) risks that relate to the key economic and market assumptions that inform the Company's business plans (including significant transactions) and growth strategies, and (b) significant operational risks related to the conduct

41

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the Company's day-to-day operations.  Risks relating to the market and economic assumptions that inform the Company's business plans and growth strategies are specifically addressed with respect to each business unit in connection with the Board's review of the Company's long-range plan. The Board also has the opportunity to address such risks at each Board meeting in connection with its regular review of significant business and financial developments. The Board reviews risks arising out of specific significant transactions when these transactions are presented to the Board for review or approval. Significant operational risks that relate to ongoing business operations are the subject of regularly scheduled reports to either the full Board or one of its committees. The Board acting through the Audit Committee reviews as appropriate whether these reports cover the significant risks that the Company may then be facing.  Each of the Board's committees addresses risks that fall within the committee's areas of responsibility. The Audit Committee addresses general risks as well as risks arising out of financial planning and reporting, internal controls and information technology. The Audit Committee reserves time at each meeting for private sessions with the Chief Financial Officer, General Counsel, head of the internal audit department and outside auditors. The Compensation Committee addresses risks arising out of the Company's executive compensation programs, as described in more detail in the section titled "Executive Compensation—Other Compensation Information—Risk Management Considerations" and workplace equity. The Governance and Nominating Committee addresses risks arising out of corporate governance, director compensation, investor engagement, political contributions and the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's ESG programs. The Governance and Nominating Committee annually reviews domestic political contribution activity as well as the procedures and controls related to political contributions. The operational risks periodically reviewed by committees are also reviewed by the entire Board when a committee or the Board determines this is appropriate.

117. The 2021 Proxy Statement further stated that the "Company has *Standards of Business Conduct*, which are applicable to all employees of the Company, including the principal executive officer, the principal financial officer and the principal accounting officer. The Board has a separate *Code of Business Conduct and Ethics for Directors* . . . ."

118. The 2021 Proxy Statement was materially false and misleading because it failed to disclose that: (i) although Disney claimed that its directors had a direct role in assessing the Company's risks, those directors were ineffective at that role; (ii) contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise those functions and instead were causing or allowing Disney to issue false and misleading statements; and (iii) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite inflating the Company's value by issuing false and misleading statements. Furthermore, the 2021 Proxy Statement was false and misleading because the Individual Defendants failed to implement and oversee effective internal controls over the Company's core operations and to manage risks associated with the essential and mission-critical maintenance of existing subscribers and addition of new ones.

119. Because of the false and misleading statements contained in the 2021 Proxy Statement, Disney shareholders voted to re-elect certain Director Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company.

## 2. The 2022 Proxy Statement

120.   On January 19, 2022, the Company filed its annual proxy statement with the SEC pursuant to Section 14(a) of the Exchange Act (the "2022 Proxy Statement"). Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

121.   The 2022 Proxy Statement solicited Disney stockholders to vote to, among other things: (1) re-elect defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice to the Board; and (2) approve the Company's executive compensation.

122.   The 2022 Proxy Statement states the following about Defendant Chapek:

> In fiscal 2021, Mr. Chapek, as Chief Executive Officer, delivered strong performance given the unprecedented challenges resulting from the COVID-19 pandemic and meaningful shareholder value, driven by exceptional execution of the Company's key strategic initiatives.

> Since March 2020, Mr. Chapek has adeptly managed the significant disruption to the Company's businesses resulting from the COVID19 pandemic and guided the Company's new management team leading our direct-to-consumer ("DTC") efforts. In fiscal 2021, under Mr. Chapek's leadership, the Company made significant progress on its long-term strategic plan with the following achievements:

> • Reorganized media and entertainment businesses to align with Mr. Chapek's strategic goals of accelerating the DTC strategy and centralizing distribution and commercialization activities;

> • Increased subscribers at Disney+, Hulu and ESPN+;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3

- Continued expansion of the Company's DTC efforts internationally, launching DTC platforms in several key international markets;

4
5
6

- Took meaningful and innovative steps at our parks and experiences business while reopening our parks, including the development of Disney Genie and new Magic Key offerings.

7

8
9
10

123.    The 2022 Proxy Statement also discussed "The Board's Role in Risk Oversight," providing substantially similar language as the was contained in the corresponding section of the 2021 Proxy Statement.

11
12
13
14
15

124.    The 2022 Proxy Statement also stated that "Company has Standards of Business Conduct, which are applicable to all employees of the Company, including the principal executive officer, the principal financial officer and the principal accounting officer. The Board has a separate Code of Business Conduct and Ethics for Directors . . . ."

16
17
18
19
20
21
22
23
24
25
26
27

125.    The 2022 Proxy Statement was materially false and misleading because it failed to disclose that: (i) although Disney claimed that its directors had a direct role in assessing the Company's risks, those directors were ineffective at that role; (ii) contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise those functions and instead were causing or allowing Disney to issue false and misleading statements; and (iii) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite inflating the Company's value by issuing false and misleading statements. Furthermore, the 2022 Proxy Statement was false and misleading because the Individual Defendants failed to implement and oversee effective internal controls over the Company's core operations and to manage risks associated with the essential and mission-critical

28

maintenance of existing subscribers and addition of new ones.

126.   Because of the false and misleading statements contained in the 2022 Proxy Statement, Disney shareholders voted to re-elect certain Director Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company.

### 3.  The 2023 Proxy Statement

127.   On February 6, 2023, the Company filed its annual proxy statement with the SEC pursuant to Section 14(a) of the Exchange Act (the "2023 Proxy Statement"). Defendants Barra, Catz, Chang, deSouza, Everson, Froman, Iger, Lagomasino, McDonald, Parker, and Rice solicited the 2023 Proxy Statement, which contained material misstatements and omissions.

128.   The 2023 Proxy Statement solicited Disney stockholders to vote to, among other things: (1) re-elect Defendants Barra, Catz, Chang, deSouza, Everson, Froman, Iger, McDonald, Parker, and Rice to the Board; and (2) approve, on an advisory basis, the Company's executive compensation.

129.   The 2023 Proxy Statement also discussed "The Board's Role in Risk Oversight," providing substantially similar language as the was contained in the corresponding section of the 2022 Proxy Statement.

130.   The 2023 Proxy Statement discussed "Fiscal 2022 Compensation Decisions," where members of the Compensation Committee determined performance bonuses by evaluating whether the Company reached certain performance goals, which are normally set at the beginning of each fiscal year.

131.   The Compensation Committee also evaluated certain "Performance Factors," which are based on the strategic objectives of the Company. These Performance Factors include: "Diversity & Inclusion", "Collaboration on strategic priorities", and "Efforts towards creativity & innovation".

132.   The "Collaboration on strategic priorities" Performance Factor is significant since it measures whether executives:

Actively promote collaboration and synergy on key strategic priorities

of the Company with a one-company mindset and drive clear accountabilities and partnership across all lines of business, in support of developing content and product for our key franchises, accelerating our DTC initiatives and enabling the success of creative, operating and corporate teams

133.   The "Collaboration on strategic priorities" Performance Factor touted that Disney "[s]uccessfully increased subscribers at Disney+ (+39%), Hulu (+8) and ESPN+ (+42%) during fiscal 2022, while launching DTC platforms in several key international markets, including 154 different countries and territories."

134.   The 2023 Proxy Statement failed to disclose the slowing pace of Disney+ subscriber growth, the Company's issues with subscriber turnover, and Disney's pursuit of short-term, low-quality subscriptions in unprofitable markets. Disney's misleading statements were quickly dispelled. On February 8, 2023, merely two days after the 2023 Proxy Statement was issued, the Company issued an earnings report for the period starting from October 1, 2022, to December 1, 2022, stating that Disney+ subscribers lost 2.4 million subscribers, and the DTC business reported an increase in operating loss from half a billion to $1.1 billion, which reflected higher programming and production costs.

135.   On May 10, 2023, during the Company's quarterly earnings call, Defendant Iger revealed to the public that Disney had "launched Disney+ in many, many markets around the world, including very low ARPU markets," and recklessly invested into marketing and local content without regard for profitability. During an earnings call on August 9, 2023, Defendant Iger put a further damper on the 2023 Proxy Statement, by suggesting a potential retreat from certain markets, stating "not all markets are created equal[.]"

136.   Thus, as made obvious by Defendant Iger's statements, for the same reasons as its predecessors, the public statements within the 2023 Proxy Statement

were materially false and misleading and lacked a reasonable basis at all relevant times.

137. In addition, the 2023 Proxy Statement was materially false and misleading because it failed to disclose that: (i) although Disney claimed that its directors had a direct role in assessing the Company's risks, those directors were ineffective at that role; (ii) contrary to the 2023 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise those functions and instead were causing or allowing Disney to issue false and misleading statements; and (iii) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite inflating the Company's value by issuing false and misleading statements. Furthermore, the 2023 Proxy Statement was false and misleading because the Individual Defendants failed to implement and oversee effective internal controls over the Company's core operations and to manage risks associated with the essential and mission-critical maintenance of existing subscribers and addition of new ones.

138. Because of the false and misleading statements contained in the 2023 Proxy Statement, Disney shareholders voted to re-elect certain Director Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company.

## **REPURCHASED SHARES DURING THE RELEVANT PERIOD**

139. During the Relevant Period, the Individual Defendants caused Disney to spend over $78.7 million to repurchase 557,313 shares at artificially inflated prices. Since the actual value of Disney's stock was $86.75 per share as of the market closing on November 9, 2022, Disney should have spent only $48.3 million to repurchase its stock during the Relevant Period. As a result of this overpayment, Disney suffered damages in the amount of approximately $30.3 million.

140. Disney's repurchase transactions during the Relevant Period are set forth below.

| Date Range | Shares | Average Price Per Share | Repurchase Amount | Overpayment |
|---|---|---|---|---|
| 12/1/2020-1/2/2021 | 18,664 | $170.44 | $3,181,092.16 | $1,561,990.16 |
| 1/3/2021-1/31/2021 | 18,215 | $173.31 | $3,156,841.65 | $1,576,690.40 |
| 2/1/2021-2/28/2021 | 18,230 | $183.36 | $3,342,652.80 | $1,761,200.30 |
| 3/1/2021-4/3/2021 | 18,820 | $193.32 | $3,638,282.40 | $2,005,647.40 |
| 4/4/2021-4/30/2021 | 17,873 | $187.26 | $3,346,897.98 | $1,796,415.23 |
| 5/1/2021-5/31/2021 | 19,292 | $172.93 | $3,336,165.56 | $1,662,584.56 |
| 6/1/2021-7/3/2021 | 15,511 | $175.91 | $3,432,180.01 | $1,739,600.76 |
| 7/4/2021-7/31/2021 | 15,923 | $180.39 | $2,872,349.97 | $1,491,029.72 |
| 8/1/2021-8/31/2021 | 15,510 | $176.90 | $2,743,719.00 | $1,398,226.50 |
| 9/1/2021-10/2/2021 | 15,493 | $179.52 | $2,781,303.36 | $1,398,225.50 |
| 10/3/2021-8/31/2021 | 15,510 | $176.90 | $2,743,719.00 | $1,491,029.72 |
| 9/1/2021-10/2/2021 | 15,493 | $179.52 | $2,781,303.36 | $1,398,226.50 |
| 10/3/2021-10/31/2021 | 16,599 | $171.24 | $2,842,412.76 | $1,402,449.51 |
| 11/1/2021-11/30/2021 | 23,036 | $157.38 | $3,625,405.68 | $1,627,032.68 |
| 12/1/2021-1/1/2022 | 28,624 | $147.64 | $4,226,047.36 | $1,742,915.36 |
| 1/2/2022-1/31/2022 | 25,595 | $142.60 | $3,649,847.00 | $1,429,480.75 |
| 2/1/2022-2/28/2022 | 20,873 | $150.26 | $3,136,376.98 | $1,325,644.23 |
| 3/1/2022-4/2/2022 | 24,942 | $168.84 | $4,211,207.28 | $2,047,488.78 |

49

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| 4/3/2022-4/30/2022 | 23,363 | $125.98 | $2,943,270.74 | $916,530.49 |
| 5/1/2022-7/2/2022 | 36,469 | $97.09 | $3,540,775.21 | $377,089.46 |
| 5/1/2022-5/31/2022 | 42,751 | $105.99 | $4,531,178.49 | $822,529.24 |
| 6/1/2022-7/31/2022 | 30,343 | $100.81 | $3,058,877.83 | $426,622.58 |
| 8/1/2022-8/31/2022 | 22,440 | $119.99 | $2,692,575.60 | $745,905.60 |
| 9/1/2022-10/1/2022 | 23,058 | $107.38 | $2,475,968.04 | $475,686.54 |
| 10/2/2022-10/31/2022 | 25,673 | $99.85 | $2,563,449.05 | $336,316.30 |
| 11/1/2022-11/30/2022 | 36,016 | $94.01 | $3,385,864.16 | $261,476.16 |
| **Total** | **557,313** | | **$78,714,741.07** | **$30,367,838.32** |

## INSIDER TRADING BY THE INDIVIDUAL DEFENDANTS DURING THE RELEVANT PERIOD

141.  During the Relevant Period and while in possession of material non-public Company information, Defendants Chapek, Iger, McCarthy, and Arnold (the "Insider Selling Defendants") sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein. These sales enabled Defendants Chapek and McCarthy to avoid the staggering losses the Company's other stockholders suffered.

142.  From January 2021 to June 2021, while in possession of material, non-public information, Defendant Iger sold 2,227,767 shares of his Disney stock for gross proceeds of $409,124,607.84 as reflected in the following chart:

| Date | Shares Sold | Avg. $/Share | Gross Proceeds |
|---|---|---|---|
| 1/20/2021 | 260,454 | $177.2000 | $46,152,448.80 |
| 1/20/2021 | 145,109 | $176.3955 | $25,596,574.61 |
| 1/20/2021 | 260,454 | $175.2983 | $45,657,143.43 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 1/21/2021 | 1,300 | $175.0000 | $227,500.00 |
| 1/22/2021 | 15,640 | $175.0066 | $2,737,103.22 |
| 2/2/2021 | 181,157 | $176.2762 | $31,933,667.56 |
| 2/2/2021 | 55,979 | $175.2390 | $9,809,703.98 |
| 2/8/2021 | 220,000 | $190.1203 | $41,826,466.00 |
| 2/23/2021 | 220,000 | $195.3877 | $42,985,294.00 |
| 2/24/2021 | 196,158 | $200.1369 | $39,258,454.03 |
| 3/8/2021 | 49,392 | $200.3747 | $9,896,907.18 |
| 3/8/2021 | 71,554 | $201.1293 | $14,391,605.93 |
| 6/1/2021 | 537,304 | $179.1980 | $96,283,802.19 |
| 6/1/2021 | 13,266 | $179.7573 | $2,384,660.34 |
| **TOTAL** | **2,227,767** | **-** | **$409,141,331.27** |

143.   From January 2021 to January 2021, while in possession of material, non-public information, Defendant McCarthy sold 122,014 shares of Disney stock, receiving gross proceeds of $17,101,572.86 as reflected in the following chart:

| Date | Shares Sold | Avg. $/Share | Gross Proceeds |
|---|---|---|---|
| 1/15/2021 | 4,139 | $173.00 | $716,047.00 |
| 1/20/2021 | 5,000 | $177.24 | $886,200.00 |
| 1/25/2021 | 25,000 | $172.00 | $4,300,000.00 |
| 1/12/2022 | 10,000 | $158.60 | $1,586,000.00 |
| 1/13/2022 | 10,000 | $158.00 | $1,580,000.00 |
| 1/14/2022 | 10,000 | $152.06 | $1,520,600.00 |
| 1/18/2022 | 15,342 | $151.54 | $2,324,926.68 |
| 1/12/2023 | 42,533 | $98.46 | $4,187,799.18 |
| **TOTAL** | **122,014** | **-** | **$17,101,572.86** |

144.   On June 2, 2021, while in possession of material, non-public

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

information, Defendant Arnold also sold 8,400 shares of Disney stock at $177.75 per share for gross proceeds of $1,493,100, as reflected in the following chart:

| Date | Shares Sold | Avg. $/Share | Gross Proceeds |
|------|-------------|--------------|----------------|
| 6/2/2021 | 8,400 | $177.75 | $1,493,100 |

145.   On August 31,2021, while in possession of material, non-public information, Defendant Chapek sold 10,587 shares of Disney stock at $182.00 per share for gross proceeds of $1,926,834, as reflected in the following chart:

| Date | Shares Sold | Avg. $/Share | Gross Proceeds |
|------|-------------|--------------|----------------|
| 8/31/2021 | 10,587 | $182.00 | $1,926,834 |

146.   As a result of the false and misleading disclosures and the failures to disclose, Defendants Chapek, Iger, McCarthy, and Arnold sold stock at artificially inflated share prices not reflective of the Company's value, which the Insider Selling Defendants knew when they were making those sales.

## DAMAGES TO DISNEY

147.   As a direct and proximate result of the Individual Defendants' actions, Disney has lost and expended and will continue to lose and expend many millions of dollars.

148.   Such losses include the nearly $30.3 million Disney overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

149.   Such expenditures also include, but are not limited to, the fees associated with the Securities Class Action, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

150.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits and other payments provided to Defendants who breached

their fiduciary duties to the Company.

151.   As a direct and proximate result of the Defendants' conduct, Disney has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

152.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

153.   Plaintiff brings this action derivatively in the right and for the benefit of Disney to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Disney.

154.   Disney is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

155.   Plaintiff is, and has been at all relevant times, a stockholder of Disney common stock and was a Disney stockholder at the time of the misconduct alleged herein.

156.   Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

157.   On July 23, 2025, Plaintiff, through Plaintiff's counsel, sent a demand on Disney's Board to investigate the violations of law described herein and to pursue remedies through litigation against the Individual Defendants for breaching their fiduciary duties by allowing Disney to issue improper statements set forth herein (the "Demand"). The Demand is attached hereto as Exhibit A.

158.   The Demand outlined alleged misstatements made during the Relevant Period that "were materially false and misleading statements in Disney's SEC filings, press releases, and conference calls regarding the Company's business, operations, and prospects."

159.   On August 4, 2025, Plaintiff received a letter on behalf of the Board acknowledging receipt of the Demand and stating that "the board will consider it in a timely manner. We will provide further response to update on the status of your request and inform you of any decision made by the board." The response is attached hereto as Exhibit B.

160.   On September 3, 2025, Plaintiff sent another letter to the Board inquiring about any developments or actions that had been taken or would be taken by the Board to address the wrongdoing set out by the Demand. The letter is attached hereto as Exhibit C.

161.   Thereafter, on October 17, 2025, Plaintiff received another letter from the Board – which was by that point represented by Potter Anderson & Corroon, LLP. The Board informed Plaintiff that it established a Demand Review Committee (the "Committee") for the purpose of investigating the matters referenced in the Demand. The Board continued by stating it would investigate the misconduct perpetrated by the directors and officers and, if appropriate, institute litigation against those individuals for breaches of their fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, violations of the SEC Act, and other misconduct. The letter is attached hereto as Exhibit D.

162.   On November 18, 2025, Plaintiff received a letter on behalf of the Board (the "Demand Refusal Letter") stating that the Committee determined to defer investigation while it continues to monitor a related shareholder securities action captioned *Local 772 Labor-Management Pension Fund et al. v. The Walt Disney Company et al.*, Case No. 2:23-cv-3661-CBM-AS (C.D. Cal.). The Demand Refusal Letter is attached hereto as Exhibit E.

163.   At the time the Board refused the Demand, the Board consisted of the following individuals: Defendants Gorman, Barra, Chang, Darroch, Everson, Froman, Iger, Lagomasino, McDonald, and Rice.

164.   The Board wrongfully refused Plaintiff's Demand and has failed to take any action to correct the breaches of fiduciary duty alleged in the Demand.

165.   The Demand Refusal Letter does not contain a written report in connection with the Board's decision to refuse the Demand. In failing to produce a report, the Company neglected to keep a proper record of its evaluation to allow Plaintiff and the Court to assess the reasonableness of its methodology in deciding to refuse the Demand. That the Company failed to issue any report is an incurable mistake to the refusal of the Demand because there is no adequate record of the investigation and no evidentiary record upon which to determine whether the Board in good faith refused the Demand.

166.   The Demand Refusal Letter asserts that the Board's refusal of the Demand is reasonable, citing the ongoing nature of the Securities Class Action as sufficient cause to refuse the demand. The Demand Refusal Letter does not, however, contain any evaluation of the merits of the Demand, nor does it communicate the Committee's conclusions regarding the merits of the Demand.

167.   The Board's decision-making to date is therefore not consistent with its obligation to determine in good faith whether the Demand's claims have merit and whether it would be in the Company's best interest to pursue them.

168.   The Board did not act independently, nor reasonably, nor in good faith, on the basis of all reasonably available information, plainly disregarding the merits of the claims and allegations in the Demand.

169.   For the foregoing reasons, the Board's refusal of the Demand falls outside the protections of the business judgment rule. Plaintiff is therefore permitted to proceed and to prosecute this action derivatively on behalf of Disney.

## CLAIM I

### Against the Individual Defendants for Breach of Fiduciary Duties

170.   Plaintiff incorporates by reference and realleges each and every

allegation set forth above as though fully set forth herein.

171.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Disney's business and affairs.

172.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

173.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Disney.

174.    In breach of their fiduciary duties owed and owe to Disney, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose that, *inter alia*: (a) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (b) by debuting certain content intended for Disney+ on Disney's legacy distribution channels and then later making the shows available on Disney+ , Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shifted costs out of the Disney+ segment; (c) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (d) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (e) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading

and/or lacked a reasonable basis at all relevant times.

175.   The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

176.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

177.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

178.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

schemes alleged herein and to prevent them from continuing to occur.

179. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

180. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Disney has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## CLAIM II
### *Against the Individual Defendants for Violations of § 14(a) of the Exchange Act and SEC Rule 14a-9*

181. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

182. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

183. The 2021, 2022, and 2023 Proxy Statements violated Section 14(a) and Rule 14a-9 because they solicited Disney stockholder votes for, *inter alia*, director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with the Company's DTC segment.

184. The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9. By virtue of their positions as officers and/or directors of the Company and roles in the process and in the preparation of the 2021, 2022, and 2023 Proxy Statements, the Individual Defendants were aware of this information and of their duty to disclose this

information in the 2021, 2022, and 2023 Proxy Statements.

185.   The Individual Defendants knew that the statements contained in the 2021, 2022, and 2023 Proxy Statements were materially false and misleading.

186.   The omissions and false and misleading statements in the 2021, 2022, and 2023 Proxy Statements are material in that a reasonable shareholder would consider them important in deciding how to vote on the re-election of directors. Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2021 Proxy Statement and the 2022 Proxy Statement and in other information reasonably available to stockholders.

187.   As a direct and proximate result of the dissemination of the false and misleading 2021, 2022, and 2023 Proxy Statements that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, Nominal Defendant Disney suffered damage and actual economic losses (i.e., wrongful re-election of directors) in an amount to be determined at trial.

## CLAIM III
### Against the Securities Class Action Defendants for Contribution under Sections 10(b) and 21D of the Exchange Act

188.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

189.   Disney, along with the Securities Class Action Defendants (Chapek, Daniel, and McCarthy), are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or directors of Disney.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

190.    Because of their positions of control and authority as officers and/or directors of Disney, the Securities Class Action Defendants were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Disney, including the wrongful acts complained of herein and in the Securities Class Action.

191.    Accordingly, the Securities Class Action Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

192.    As such, Disney is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

## CLAIM IV

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))

193.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

194.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase Disney stock at prices artificially inflated by those materially false and misleading statements.

195.    Plaintiff, on behalf of Disney, has no adequate remedy at law.

## CLAIM V

### Against the Individual Defendants for Waste of Corporate Assets

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

197.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

198.   In addition, the Individual Defendants caused the Company to repurchase hundreds of thousands of shares of Disney common stock at artificially inflated prices during the Relevant Period.

199.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

200.   Plaintiff on behalf of Disney has no adequate remedy at law.

## CLAIM VI

### *Against all the Individual Defendants for Aiding and Abetting*

201.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.   Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Defendants are in breach of their fiduciary duties to Disney and has participated in a conspiracy in breach of fiduciary duties.

203.   In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

204.   The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the Company and its shareholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

205.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

206.   Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

207.   Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## CLAIM VII

### Against the Insider Selling Defendants for Insider Selling and Misappropriation of Information

208.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.   At the time of their stock sales set forth herein, the Insider Selling Defendants (Chapek, Iger, Arnold and McCarthy) knew of the information described above and sold Disney common stock on the basis of such information.

210.   The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the

Company, which the Insider Selling Defendants used for their own benefit when they sold Disney common stock.

211.   The Insider Selling Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

212.   Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

## CLAIM VIII

### *Against the Individual Defendants for Unjust Enrichment*

213.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

214.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Disney.

215.   The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Disney that was tied to the performance or artificially inflated valuation of Disney, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

216.   Plaintiff, as a shareholder and representative of Disney, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and breach of their fiduciary duties.

217.   Plaintiff on behalf of Disney has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring that Defendants have breached their fiduciary duties to Disney and committed other violations of state and federal law, including, but not limited to, corporate waste;

B.   Declaring that Plaintiff may maintain this action on behalf of Disney and that Plaintiff is an adequate representative of the Company;

C.   Determining that this action is a proper derivative action maintainable under law;

D.   Determining and awarding to Disney the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

E.   Directing Disney to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with Disney's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

F.   Awarding Disney damages including, without limitation, punitive damages, together with pre-and post-judgment interest to the Company;

G.   Providing extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of Disney, has an effective remedy;

H.   Awarding Disney restitution from Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1        I.      Awarding to Plaintiff the costs and disbursements of the action,

2 including reasonable attorneys' fees, accountants' and experts' fees, costs, and

3 expenses; and

4        J.      Granting such other and further relief as this Court deems just and

5 equitable.

6                            **<u>JURY TRIAL DEMANDED</u>**

7       Plaintiff hereby demands a trial by jury.

8

9                           Respectfully submitted,

10

11 Dated: March 10, 2026       **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

12                       /s/ *Betsy C. Manifold*

13                       BETSY C. MANIFOLD

14

15                       BETSY C. MANIFOLD (182450)
                      manifold@whafh.com

16                       RACHELE R. BYRD (190634)
                      byrd@whafh.com

17                       STEPHANIE AVILES (350289)
                      saviles@whafh.com

18                       750 B Street, Suite 1820
                      San Diego, CA 92101

19                       Telephone: (619) 239-4599
                      Facsimile: (619) 234-4599

20

21                       **THE ROSEN LAW FIRM, P.A.**
                      LAURENCE M. ROSEN (219683)

22                       355 South Grand Avenue, Suite 2450
                      Los Angeles, CA 90071

23                       Telephone: (213) 785-2610
                      Facsimile: (213) 226-4684

24                       Email: lrosen@rosenlegal.com

25                       *Counsel for Plaintiff Karen Gioli*

26

27

28

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## **VERIFICATION**

I, Karen Giolli am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

1/30/2026

Karen Giolli

Karen Giolli